110-3542, City of Chicago v. Williams, Baltimore. Counsel, you may proceed. Good morning, Your Honors. Counsel, may it please the Court. My name is Joseph Zwick. I represent the City of Chicago, the appellant in this claim. Your Honors, this claim really involves an error in an award of benefits for two separate and distinct periods of time. The first period was the award of maintenance benefits between October 1 of 2006 and June 12 of 2007. Up until that time, the record is clear. Mr. Barhume injured his right shoulder. He had shoulder surgery in 2003. Treated essentially up until February of 2004, which time follow-up arthroscopy was considered. And regardless of whether it was diagnostic or the purpose of the arthroscopy, Mr. Barhume didn't want to undergo the surgery at that time, and he was released for restrictions. Remained off of work until October of 2006. Prior to starting his job, at which time he returned as a watchman, as opposed to his labor position. Prior to starting that position, Mr. Barhume contacted his union, spoke with Carol James, and inquired about returning back to his original job as a laborer. Ms. James testified that she explained he should contact his attorney and talk about addressing his restrictions. Mr. Barhume saw his treating doctor, Dr. Robb, on October 18, 2006, at which time Dr. Robb clearly states that Mr. Barhume is able to return to his employment. That was Dr. Robb's conclusion. Now, in that statement, he added a statement that if someone was looking for objective criterion, an FCE would be indicated, but his conclusion at that point was that Mr. Barhume was able to work his regular job. Mr. Barhume did eventually undergo the FCE. The conclusion by the therapist was that Mr. Barhume had demonstrated the ability to perform his regular job as a laborer for the water department. Excuse me. Mr. Barhume also had seen the doctors at Sage Family Medical and advised them that he wanted to go back to his regular job, but that his supervisor wouldn't let him. Sometime before or after he saw Dr. Robb, Mr. Barhume states that he spoke with someone at the city who he states told him that he should get an FCE or get a full duty release. Excuse me. Regardless of any other factors, there is no evidence contrary to the fact that Mr. Barhume was cleared to return to his regular job as a laborer for the water department as of October 18, 2006. Mr. Barhume was unable to go back to that job because of employment issues, because of the prior restrictions he was claiming. Mr. Barhume necessarily gave up his job at the water department and eventually was hired as a watchman. And at that point, the job for the water department was no longer available to him. And regardless of whether or not there was a job available to him, the fact of the matter is, Mr. Barhume was not receiving treatment at that time. He had only been seen for evaluations, and he had been cleared by every doctor, everyone involved, and even claimed himself that he was able to do his regular job. All right, so you're saying, in essence, the law is that if somebody's reached MMI, he may still be entitled to maintenance under Section 8A of the Act while he's in the prescribed rehabilitation program. Here, his condition had stabilized, he had been through the rehabilitation program, and the commission still gave him maintenance. Correct. And that's where the rub is. He was cleared to go back to work. Cleared to go back to his full duty employment. And he had completed the rehabilitation program, correct? Well, correct. He had gone through the so-called rehabilitation program. But regardless of that, ultimately, he's medically cleared to go back to his regular job, and that's uncontroverted evidence. There's no other conclusion that can be drawn with regard to the period from October 18, 2006, up through June 12 of 2007. What about the other issues? Well, the other issues in terms of the second period, he, of course, ended up having a subsequent surgery and treated post-operatively until January 11, 2008. And at that time, his doctor provided him, again, his new doctor provided him with a clearance to return to full duty employment. And the release to return to full duty employment clearly states or clearly provides options in terms of whether restrictions are indicated or whether he can work without any kind of restriction. And clearly, the note states that Mr. Bahome, at that point, was released for full duty employment. Now, Dr. Hoffman testified in his deposition. His statement was, well, I think it would be pretty unlikely he's going to be able to do that job. But he doesn't really say he can't do it. He just says, I think it's pretty unlikely. And the fact of the matter is, at this point, Mr. Bahome simply can't go back to that job because he doesn't have that job available to him anymore. It's not a matter of whether he's physically able to do it or not. It's a matter of the fact that this job isn't available to him anymore. Well, he says it's pretty unlikely. I mean, he had to be in pretty good physical shape. He's got to repetitively lift and carry up to 100 pounds, doesn't he? He does. So now he's got the two shoulder surgeries. And the opinion of Hoffman, he believes it's unlikely he's going to be able to do the same things after these operations. So why can't the commission believe him? Well, because he had already released him to return to his full unrestricted activity. And his statement, the follow-up statement isn't, you know, it's not a clear-cut opinion that this condition is going to prevent him from doing so. It's a statement in light of the fact that he's already provided him a full-duty release without restriction when he had the opportunity to address restrictions. And then after the fact, saying at the most he's going to say is that it's pretty unlikely. Well, let's really look at it. Is that really true that he cleared him? He released him to return as a laborer but as a watchman. There's a difference. Certainly there is a difference. It's a major, it's a critical difference. Potentially it's critical, but the real fact of the matter is that the release that he provided addressed his abilities, addressed his whether or not there were limitations indicated at that time. I mean, it was, there were several options, release to return to work completely, release to return to work within X number of pounds, release to return to work at higher levels, and release to return to work with specific restrictions that he could have specified. Dr. Hoffman marked that he, that the restriction was for full duty. And so, you know, in terms of. But he did not, are we getting the full picture? I mean, I realize as an advocate you've got to emphasize your evidence, but I think it's clear Hoffman testified that prior to the deposition, he did not have a detailed description of the claimant's duties as a laborer. He then later on supplemented the opinion and said, claimant would be unable, specifically unable to do repetitive overhead activities above shoulder level, and he can't do it with significant amounts of weight. Didn't he testify to that? He would have difficulty with significant amounts of weights. But again, it's an issue with whether or not someone's unable to do it, whether or not they're going to have difficulty to the extent they're going to have any kind of difficulty. The other reality in this case is that Mr. Bonfumi didn't have that job to go back to, you know, regardless of any kind of medical condition. The real reason he didn't have the job to go back to was he necessarily gave it up to accept the watchman position. So, you know, and ultimately when we're looking at that issue in terms of all the evidence presented, you know, I know counsel in his brief suggested that we're sort of creating this impression that Mr. Bonfumi was faking his condition. Certainly he had real shoulder surgeries. Certainly he had a real accident. We're not disputing that. The issue with regard to Mr. Bonfumi's abilities, or the issues with regard to the effort he put forth, has to do with what his true abilities are. In 2004, when he was seeking benefits, when he was receiving benefits, his exams were inconsistent. The treating doctors, the treating therapists noted inconsistencies during the evaluation. The functional capacity evaluation at that time showed a level of criteria that he didn't meet that showed it was an invalid study. When he wanted to go back to his job as a laborer, now he's giving forth a full effort, and now he's demonstrating an ability to perform the job within that level. Thank you. Thank you, counsel. Good morning, Your Honors. Counsel. May it please the Court, my name is Dennis Lynch from the Healy Law Firm. I represent Mr. Barhume, the claimant and appellee in this matter. In this case, a unanimous commission found in favor of Mr. Barhume on all issues, and specifically found that the opinions of the physician retained by the City of Chicago, Dr. Walsh, were unpersuasive. As this Court has repeatedly instructed as recently as this morning, in order to overcome those findings, the City has to show that they are against the manifest weight of the evidence. In other words, that no rational trier of fact would agree with those findings. Of course, a finding isn't against the manifest weight. Okay. Okay? Okay. Manifest weight is whether an opposite conclusion is clearly apparent. Right. Don't get into this rational trier of fact. Okay. In any event, Your Honor, it's not against the manifest weight of the evidence, even if there's conflicting evidence in the record. Because they don't look experts, you're saying. Right. You've got Walsh, the commission specifically found him unpersuasive, the arbitrator did. Right. You've got your Dr. Hoffman, the commission arbitrator believed, okay, that's, I understand that. Right. What about this maintenance? How does he get maintenance? How is he entitled to maintenance if he's cleared to return to work, the condition is stabilized, he's gone through a rehab program? Why does he get maintenance? Well, a couple issues, Your Honor. Number one, I don't think that this condition has stabilized. There's surgery that's recommended in 2004. He later undergoes that surgery in 2007. So his condition hasn't stabilized until January of 2008 when he's discharged from physical therapy. Number two, what the timeline is, is October 1st, he starts commission as a watchman. He was placed there through the City of Chicago's own vocational program. He's not paid any wage differential. He's told if he wants to get a wage differential, he needs to pursue matters with his attorney. Otherwise, if he wants to get his full payback, he can get a full duty release and he can go back to work as a laborer. He goes to Dr. Rob. Dr. Rob says that he thinks he might be able to go to work, but that if objective criteria are required, he should go through an FCE. He takes that note to Mercy Works, to the City of Chicago's own occupational clinic. Mercy Works isn't satisfied with the note from Dr. Rob. They ask for an FCE. The FCE shows he can't work as a laborer. He cannot lift 100 pounds continuously, which is a minimum physical requirement for a water pump laborer. Let me ask you, as a matter of law, to receive maintenance, isn't the inquiry whether or not he's reached MMI, and whether his condition is stabilized, not whether he can return to the position to which he was working at the time of the injury? Are you saying that as long as he can't return to the position he had before he was injured, he gets maintenance? I'm saying if he cannot, because he still cannot physically meet that requirement because he didn't lift 100 pounds continuously, or because of the initial restriction from Mercy Works, which is that he could only work 50 pounds, if he goes to an accommodated position that pays half his wages, then yes, he'd be entitled to maintenance to make up for the difference. What case law holds that? The NASCO case is the most similar situation, where the employee was working 4-hour shifts instead of 8-hour shifts, and was awarded maintenance. You're talking about international scaffolding? Yes. Okay. You don't think that holds a contrary position to what you're arguing? I don't, Your Honor. In fact, in international scaffolding, the Supreme Court recognizes the same thing, that the employee was working 4-hour shifts and attending physical therapy, and was paid a maintenance benefit to make up for those wages. So then, according to you, he'd be entitled to maintenance, as long as he can't go back to lifting the 100 pounds, which he maybe can never do, but he should get maintenance? Yes. Or is that as long as he's getting physical therapy or treatment for his condition? Well, I think it's as long as he's in any sort of either vocational or rehabilitation program, and I think the city's own vocational program to try and find him accommodated employment falls into that category. But he completed the rehabilitation program, didn't he? Well, I don't think so. I mean, they voked him and they placed him temporarily in a position, but they weren't paying him any wage differential. I think the only inference that can be drawn. Well, they put him in a maintenance position, or a maintenance, right? I'm sorry? They put him in, not maintenance, but a watchman. An accommodated watchman position. Or is this his permanent job with the city now? Well, at this point, I mean, as we sit here today or at the time of trial, it was a permanent job. At that time, I don't know. So what you're saying under that case is that really maintenance becomes an effective kind of temporary wage differential. I think that's a fair point, yes. I mean, I think if he hasn't reached MMI. That only becomes, that ends at what point? Well, it would end when the employee reaches MMI, which in this case is in January 2008, and the evidence then makes it that the wage differential is permanent. For instance, if Mr. Barhumi had undergone his second surgery and was truly released without restrictions, which isn't the case here, and he was able to return to his old job, then it wouldn't be a situation where he'd continue to get a wage differential benefit. He would have been able to get that maintenance award for that middle period, and then he would get another nature and extent award. But in that instance, the maintenance award is corporate. So does he get a maintenance while he's working as a watchman? Yes. On what theory? On the theory, the same theory in the NASCO case, that he is in a vocational program, he's not making his same wages, and the maintenance costs are awarded to make up the difference that he paid. And he's paid the full difference? He's paid, he would be paid, I believe it was awarded at two-thirds the difference between what he was making as a watchman and his old TTE rate. Which is the same thing as temporary partial disability. Correct. And that's what the arbitrator ordered? No, the arbitrator actually ordered that the wage differential start on October 1, 2006, and then the commission modified it to reflect a maintenance award. Okay, but I mean, what was he paid, what would he have been paid under the arbitrator's award? Because he was working during that time. Under the arbitrator's award, the math doesn't change. The arbitrator's award. He gets paid the same amount either way. Right. Whether we're calling that maintenance or temporary partial disability. Right. Or maintenance or a wage differential starting at that point. Right. So whether it's the arbitrator's award was that the wage differential started on October 1, 2006, the commission modified it to reflect that he wasn't at MMI until January 2008, and that the wage differential award itself started beforehand, but he was entitled to maintenance for that middle period. The money doesn't change either way. It's just the characterization of what it is. That's correct. If I can briefly touch on the wage differential award and specifically to Dr. Walsh's opinions, the commission found that his opinions weren't persuasive. In any event, Dr. Walsh didn't truly pass on whether or not Mr. Barhomey would have restrictions. Dr. Walsh's opinion was that there was no causal connection between the 2007 surgery and the 2003 accident. That's an argument that's been abandoned by the City of Chicago at this point. Dr. Walsh's opinion was just that any restrictions he would have wouldn't be related to that 2007 surgery. And so there's been an attempt in the briefing to suggest that Dr. Walsh had an opinion that there was no restrictions. I don't think that's a fair characterization of his opinion. Even if that was the opinion he had, the commission had the role of resolving that conflict and weighing the credibility and found that Dr. Hoffman's opinion was correct. I'm assuming my time is up or almost up. Well, if you choose to. I think the only other issue I want to touch on, Your Honor, of the FCE from January of 2007, it reflected that he couldn't work 100 pounds continuously. That was performed by the City of Chicago's own clinic. They did not send that FCE to their own physician that they retained to examine Mr. Barhume. If they thought it was supportive of their position, I'm sure they would have. Unless there's any other questions, I would ask that you affirm the judgment of the commission. Thank you, Counsel. Counsel, rebuttal? Just real briefly, thank you, Your Honor. Let me ask a quick question. You object to the maintenance from October of 2006 to June of 2007, the maintenance award for that time period. Correct. Was he entitled to temporary partial disability during that time when he went back to the reduced pay? No, he wasn't. And that goes along with the one point I would like to bring up on the rebuttal. That's what the arbitrator ordered originally, though. He ordered wage differential. He's called it wage differential, but on a temporary basis. Correct. And temporary partial disability wasn't part of the act back then, but regardless. Oh, okay. Regardless, the issue with regard to temporary partial disability, you still have to demonstrate disability. And Counsel just said that the functional capacity evaluation that was completed in January of 2007 determined that he cannot lift 100 pounds continuously. The FCE does not state that. What Counsel is referring to is the fact that they tested at various levels. They tested him, his ability to carry on an occasional basis, and he tested an ability to carry 100 pounds occasionally. He's drawing from that an insinuation or a conclusion that the therapist felt he was unable to carry 100 pounds continuously. And that's not what it says. The conclusion in the FCE and the conclusion by the doctors who looked at the FCE was that he was able to return to his regular job as a laborer for the water department. And I think of a situation where an engineer inspects a bridge, and an engineer, say, sends 10 cars over, sends 10 trucks over and says, this bridge is structurally sound, it would withhold the rigors of rush hour traffic and traffic throughout the course of a day. Now, of course, the engineer didn't put rush hour traffic on the bridge to test it. He did it based on his experience as an engineer and his experience in terms of interpreting data. In this case, in this instance, the therapist interpreted the physical demonstrations by Mr. Barhume, and she concluded that he was able to return to his regular job as a laborer for the water department. The doctors also concluded the same thing. Thank you. Thank you, Counsel.